IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Criminal Action No. |
| ) | 03-00171-01-CR-W-ODS |
| HESSAM GHANE, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTION TO SUPPRESS**

Before the court is Defendant's Motion to Suppress. Defendant moves the court to suppress evidence of the cyanide seized during the search of his residence since the police did not have a warrant or valid consent to conduct the search.

*I. BACKGROUND*

On February 4, 2003, Independence, Missouri police officers were dispatched to Defendant's residence in response to a third-party call to crisis hotline in which the caller reported Defendant threatening to harm himself by taking an "unknown poison." When the officers arrived at Defendant's apartment, Defendant stated that he was "having a bad day" and wanted to go to Independence Regional Hospital. The officers explained that Independence Regional Hospital no longer had a psychiatric unit and offered take him to Truman Medical Center East, instead. Defendant stated he would rather go to Overland Park Regional Medical Center.

Upon arrival at Overland Park Regional Medical Center, Emergency Room Physician's

1

Assistant Gleb Gluhovsky ("PA Gluhovsky") conducted an intake interview. Defendant told PA Gluhovsky that he was depressed and wanted to kill himself by using a "solid form of cyanide"; he also reported hostility toward others. After Defendant was admitted to the mental health unit, PA Gluhovsky conveyed this information to the Independence, Missouri Police Department. Detectives Jeff Seever and Virginia Hill were dispatched to Overland Park Regional Medical Center later that same day and interviewed Defendant in his room. At the conclusion of the interview, Detective Seever asked Defendant if the police could search his apartment for cyanide. Defendant acquiesced to this request, both verbally and by signing a written consent to search form. On February 5, 2005, police searched Defendant's apartment and recovered 177 grams of potassium cyanide.

On May 15, 2003, an indictment was returned charging Defendant with one count of knowingly stockpiling, retaining, and possessing potassium cyanide, which was not intended to be used for a peaceful purpose, in violation of 18 U.S.C. § 229(a)(1). He filed a motion to suppress on August 12, 2005. On October 28, 2005, I conducted an evidentiary hearing on this motion. The government appeared by Assistant United States Attorney Michael Green. Defendant was present, represented by retained attorneys James Wyrsch and Justin Johnston. The government called Gleb Gluhovsky, Dr. Howard L. Houghton, Detective Jeff Seever, Police Officer Robert Brady, Detective Jeff Lawhon, Sergeant Billy Trotter, and Detective Aaron Gietzen. Defendant called Dr. Delany Dean. In addition, the following exhibits were marked and admitted into evidence:

        Government's Exhibit 1:       2/4/03 Emergency Physician Report - Health Midwest
        Government's Exhibit 2:       Consent to Search Residence, dated 4/2/03
        Government's Exhibit 2a:     Evidence Log, dated 2/5/03

| | |
|---|---|
| Government's Exhibit 3: | Picture of two men in Hazmat suits |
| Government's Exhibit 4: | Consent form for Overland Park Regional Medical Center Mental Health Unit |
| Defendant's Exhibit 11: | Psych Report |
| Defendant's Exhibit 15: | Medication Administration Record |
| Defendant's Exhibit 17: | Report of Dr. Delany Dean |
| Defendant's Exhibit 18: | Photographs of books. |

I took judicial notice of the prior reports regarding Defendant's mental state, as well as the most recent report that found him competent to stand trial (Tr. at 193).

## II. EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1. Defendant was transported to Overland Park Regional Medical Center's Emergency Room by Independence, Missouri Police Officer Robert Brady on February 4, 2003 (Tr. at 9-10, 112, Gvt. Ex. 1). Emergency Room PA Gluhovsky recorded Defendant's complaints as "depressed, angry, frustrated, agitated" and as having "suicidal thoughts" with a "specific plan" (Tr. at 23-24, Gvt. Ex. 1). Defendant was not reported as being hostile, paranoid, confused or hallucinating (Tr. at 24-26, 30, Gvt. Ex. 1). Upon examination, PA Gluhovsky found Defendant "alert and oriented x 3" (Tr. at 31, Gvt. Ex. 1). Defendant followed all questions he was asked by PA Gluhovsky and responded in an appropriate manner (Tr. at 31). Laboratory tests revealed that Defendant was not under the influence of narcotics or another illegal substance (Tr. at 35).

2. After conducting the intake interview, PA Gluhovsky contacted the Independence, Missouri Police Department due to the potential for public harm (Tr. at 15).

3

Detectives Jeff Seever and Virginia Hill were dispatched to Overland Park Regional Medical Center to speak with Defendant (Tr. at 84). When they arrived at the hospital, PA Gluhovsky advised them that Defendant was depressed, suicidal, and that he had made a statement about hurting himself by using cyanide (Tr. at 85, 95-96).

3. After speaking with PA Gluhovsky, Detectives Seever and Hill proceeded to the mental health unit to meet with Defendant (Tr. at 87). The mental health unit at Overland Park Regional Medical Center is a locked facility and individuals must obtain permission before entering the wing (Tr. at 87, 96). Detectives Seever and Hill were granted access to the unit by Defendant's evaluating nurse, Vicki Latimer, who informed them that this was the second time he had been in the unit (Tr. at 86, 96, 97). She advised the detectives that Defendant expressed he was depressed, suicidal and that he planned to kill himself using cyanide (Tr. at 97). She also stated that although Defendant admitted himself voluntarily, he was not free to leave until released by a doctor due to his threat of suicide (Tr. at 97-98, 57). Ms. Latimer gave Detectives Seever and Hill permission to interview Defendant in his room (Tr. at 98).

4. Defendant had an individual room with two beds (Tr. at 88). When the detectives entered the room, Defendant was sitting on the far bed closest to the window (Tr. at 88, 98). Detectives Seever and Hill identified themselves and asked Defendant who he was, to which Defendant correctly identified himself (Tr. at 88). The detectives then began talking to Defendant about his situation and asked how he

4

Case 4:03-cr-00171-KHV   Document 129   Filed 12/14/05   Page 4 of 12

was feeling (Tr. at 88). Detectives Seever and Hill told him that he was not under arrest but that they were just there to talk to him (Tr. at 89, 99).

5. During the detectives' conversation, the door to Defendant's room remained open (Tr. at 89). The detectives wore plain clothes and neither displayed any weapons (Tr. at 89, 108). Defendant was not placed in handcuffs (Tr. at 89). When talking to the detectives, Defendant sat up in his bed; Detective Seever was sitting in the window well and Detective Hill was beside him. (Tr. at 88, 98). The detectives did not place themselves between Defendant and the door, and Defendant could have left the room without having to walk past them (Tr. at 98-99).

6. Defendant agreed to talk to the detectives and told them more about himself (Tr. at 89-90). Defendant revealed that he had been a chemist at Maple Woods Community College (Tr. at 86). He also told the detectives that he came to the United States from Iran and had been recruited by the FBI to spy on Iran (Tr. at 90). Defendant stated that when he declined, he was targeted by the FBI and they had destroyed his life (Tr. at 90). He further reported domestic problems and felt his depression was due to the fact that he did not have a lot going for him in life (Tr. at 90). Defendant was fifty-three years old at the time of the interview (Def. Ex. 11).

7. When Detective Seever asked Defendant whether he was planning to kill himself with cyanide, Defendant responded that he did not have any cyanide but did have access to some (Tr. at 90). He specifically advised Detective Seever that he did not have any cyanide in his apartment (Tr. at 90). Detective Seever asked

Defendant if he could search his apartment for cyanide and Defendant responded that he could (Tr. at 91, 101).

8. Detectives Seever and Hill then left Defendant's room, typed a consent to search form on a hospital computer, and returned to obtain Defendant's signature (Tr. at 91, 101, Gvt. Ex. 2). Detective Seever presented the consent to search form to Defendant and allowed him to read the form (Tr. at 91). Defendant signed and dated the form "04/02/03"; Detective Seever and Detective Hill also signed the form (Tr. at 92-93).

9. During the forty-minute encounter, Defendant's demeanor was flat, very passive and unhappy (Tr. at 93, 94, 100). Detective Seever stated that he did not appear to be hallucinating and was oriented to time and place (Tr. at 93). He found his conversation with Defendant to be very straightforward, sequential, and logical (Tr. at 93). Defendant responded appropriately to all questions (Tr. at 94). He advised the detectives that he was under the care of another physician, Dr. Botts, for a psychiatric disorder (Tr. at 99). At some point in their conversation, Defendant told Detective Seever he was taking three different medications for depression and informed him that he had taken his medication that day (Tr. at 94, 95, 99).

10. Defendant was treated by Dr. Howard Houghton during his February 4, 2003, admission to Overland Park Regional Medical Center (Tr. at 41, Def. Ex. 11). Dr. Houghton first met with Defendant on the morning of February 5, 2003, at which time he found Defendant hostile and irritable (Tr. at 41, 42). Dr. Houghton

dictated the following observations after performing a mental status examination:

> [Defendant's] mental status examination reveals a dysthymic,[1] but unusually paranoid patient. He is rather irritable and demanding at times. At other times, he covers up his head and refuses to talk. He is marginally cooperative. He is alert and oriented x 3. Short and long-term memory seems to be intact. Regular rate and rhythm of speech. [Generally] logical thought progression. He is markedly paranoid. He is generally alert and oriented. . . . There is no evidence of hallucinations. Insight and judgment are poor.

[Def. Ex. 11, Tr. at 69]. When Dr. Houghton later presented Defendant a Overland Park Regional Medical Center Mental Health Unit Consent Form sometime between February 5, 2003 and February 13, 2003, via his nurse, Dr. Houghton believed Defendant to be competent to execute the form (Tr. at 71).

11. At the suppression hearing, Dr. Delany Dean testified on behalf of Defendant (Tr. at 156-187). Dr. Dean formed her opinion by reviewing Defendant's medical records from local psychiatric hospitals, reports of psychological evaluations conducted at the Federal Medical Center, and based upon her own examinations of Defendant that lasted a total of five to six hours (Tr. at 158, Def. Ex. 17). She did not have any contact with Defendant on February 4, 2003 (Tr. at 173). Based

---

[1] "Dysthymic" is defined as "[r]elating to dysthymia." STEDMAN'S MEDICAL DICTIONARY 536 (26th ed. 1995). Dysthymia is
> [a] chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness.

Id.

7

upon these materials, Dr. Dean concluded that Defendant was not competent to execute the consent to search form (Tr. at 173, Def. Ex. 17). She opined that Defendant's severe mood disorder and psychosis rendered him unable to appreciate, fully understand, and ultimately waive his constitutional rights (Tr. at 162, 166-167, Def. Ex. 17).

### III. LEGAL ANALYSIS

The Fourth Amendment prohibits unreasonable searches and seizures of an individual's residence. U.S. CONST. amend. IV; see also Illinois v. Rodriguez, 497 U.S. 117, 183 (1990). This prohibition does not apply, however, when the individual whose residence was searched gave law enforcement officers valid consent to do so. United States v. Gipp, 147 F.3d 680, 685 (8th Cir. 1998). In order to be valid, consent must be knowingly and voluntarily given. United States v. Cedano-Medina, 366 F.3d 682, 684 (8th Cir. 2004)

The voluntariness of consent is "a question of fact to be determined from all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 249 (1973). The government bears the burden of proving by a preponderance of the evidence that the consent was valid. Cedano-Medina, 366 F.3d at 684. Characteristics relevant in determining whether voluntary consent was given include:

> (1) [the individual's] age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the

8

legal system.

United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990) (citations omitted). Moreover, the environment in which consent was given should also be analyzed. Chaidez, 906 F.2d at 380. The court should consider whether the individual:

> (1) was detained for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred.

Id. These factors "should not be applied mechanically, and no single factor is dispositive or controlling." United States v. Bradley, 234 F.3d 363, 366 (8th Cir. 2000) (citation omitted).

In this case, Defendant's personal characteristics and his environment demonstrate that consent was voluntarily given. At the time he consented to law enforcement officers searching his apartment, Defendant was a fifty-three year old man with above-average intelligence. He was not under the influence of narcotics or any other illegal substance.

Additionally, Detectives Seever and Hill interviewed Defendant in his private room for approximately forty minutes. No promises or misrepresentations were made to induce Defendant to consent and Detectives Seever and Hill did not threaten, physically intimidate or punish him. Both detectives wore plain clothes and did not display any weapons. During the interview, the door to Defendant's room remained open and neither detective stood between Defendant and the door or otherwise prevented him from leaving the room. After Defendant gave verbal consent, both Detectives Seever and Hill left Defendant's room for a period of time to prepare a written

9

consent form. When they returned, Defendant still agreed to allow law enforcement officers search his residence and did, in fact, execute the written form.

Although these characteristics indicate Defendant's consent was voluntarily given, Defendant maintains that his delusional mental state militates in favor of finding otherwise. Based largely upon the testimony of Dr. Dean as well as on Dr. Houghton's report and testimony that Defendant exhibited poor insight and judgment, defense counsel argues that Defendant was not competent to execute the consent to search form. This argument is not consistent the Eighth Circuit's legal standard for voluntary consent.

Rather than relying on an individual's subjective mental state, the Eighth Circuit focuses on how a reasonable law enforcement officer perceived the consenting individual's state of mind. Cedano-Medina, 366 F.3d at 685 (holding that the defendant's "actual subjective state of mind at the time that he allegedly gave his consent is not determinative"); see also United States v. Esquivias, 416 F.3d 696, 700 (8th Cir. 2005); United States v. Lopez-Rodriguez, 396 F.3d 956, 958-59 (8th Cir. 2005). The government must thus show that a reasonable law enforcement officer believed the individual's consent "was 'the product of an essentially free and unconstrained choice,' and that the [individual] comprehended the choice that he or she was making." Cedano-Medina, 366 F.3d at 684. As a result, an individual "can render a search legal by behaving in a way that would cause a reasonable person to believe that he or she has knowingly and voluntarily consented, whether or not the [individual] actually intends to consent." Id. at 684-85.

In this case, it was reasonable for Detectives Seever and Hill to believe Defendant's consent was voluntarily given. Detectives Seever and Hill were given permission to interview

Defendant by his evaluating nurse. During the forty minutes they spent with Defendant, Detective Seever believed he was oriented to time and place and was not hallucinating. Defendant sat up from his bed and engaged in a "straightforward, sequential, and logical" conversation. He responded appropriately to all questions. Although it is not certain whether Defendant actually had been recruited by the FBI, given the post-September 11, 2001, time frame in which the interview took place, it is not at all unreasonable for the detectives to have believed his story. The fact that Defendant dated the consent to search form "04/02/03" rather than "02/04/03" should not have suggested that Defendant lacked the mental capacity to give voluntary consent, either. Defendant correctly used the representative number for the month and day; it is not uncommon to notate the date by listing the day before the month.

Defendant also demonstrated an understanding of his mental state. When members of the Independence Police Department arrived at his apartment, Defendant had enough self-awareness to know that he needed help and even voiced a preference to be taken to Overland Park Regional Medical Center. At the hospital, Defendant gave the detectives the name of another psychiatrist who was treating him, told them of the medications he was taking, and stated that he had taken his medications that day. When Detective Seever asked Defendant if police could search his residence, Defendant gave consent both verbally and by reading and executing a written consent to search form. The totality of this series of events would not have indicated to the detectives either that Defendant did not know he was consenting to a search of his residence or that he did not comprehend his choice.

For the above-stated reasons, it is

RECOMMENDED that the court, after making an independent review of the record and

the applicable law, enter an order denying Defendant's Motion to Suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of this report and recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

/s/ *Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
December 13, 2005