IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,      )
      )
      Plaintiff,      )
      )
v.      )      Criminal Action No.
      )      03-00171-01-CR-W-ODS
HESSAM GHANE,      )
      )
      Defendant.      )

**REPORT AND RECOMMENDATION TO
DENY DEFENDANT'S MOTION IN LIMINE**

Before the court is Defendant's Motion in Limine to Exclude Statements on the Basis of the Psychotherapist-Patient Privilege. Defendant moves the court to exclude from trial any statements he made to Overland Park Regional Medical Center's Emergency Room Physician's Assistant Gleb Gluhovsky ("PA Gluhovsky") during an intake interview and to his treating psychiatrist, Dr. Howard Houghton, after being admitted to the Mental Health Unit.

## I. BACKGROUND

On February 4, 2003, Independence, Missouri police officers were dispatched to Defendant's residence in response to a third-party call to a crisis hotline in which the caller reported Defendant threatening to harm himself by taking an "unknown poison." When the officers arrived at Defendant's apartment, Defendant stated that he was "having a bad day" and wanted to go to Independence Regional Hospital. The officers explained that Independence Regional Hospital no longer had a psychiatric unit and instead offered take him to Truman Medical Center East. Defendant stated he would rather go to Overland Park Regional Medical Center.

1

Upon arrival at Overland Park Regional Medical Center, Emergency Room Physician's Assistant Gleb Gluhovsky ("PA Gluhovsky") conducted an intake interview. Defendant told PA Gluhovsky that he was depressed and wanted to kill himself by using a "solid form of cyanide"; PA Gluhovsky believed Defendant also posed a danger to others. After Defendant was admitted to the Mental Health Unit, PA Gluhovsky conveyed this information to the Independence, Missouri Police Department.

Dr. Howard Houghton acted as Defendant's treating psychiatrist during his admission. When Dr. Houghton met with Defendant on February 5, 2003, Defendant made threats toward government agencies, specifically the Corps of Engineers, and stated that he had access to chemicals. These threats concerned Dr. Houghton and he sought advice from Overland Park Regional Medical Center's Risk Management Department regarding possible disclosure. Acting upon Risk Management's advice, Dr. Houghton informed Defendant that he needed to notify the appropriate authorities about Defendant's threats and asked Defendant to sign a form that authorized Dr. Houghton to share his medical information. Based upon this consent, Dr. Houghton then spoke to FBI Special Agent David Cudmore.

On May 15, 2003, an indictment was returned charging Defendant with one count of knowingly stockpiling, retaining, and possessing potassium cyanide, which was not intended to be used for a peaceful purpose, in violation of 18 U.S.C. § 229(a)(1). He filed the instant motion in limine on August 12, 2005 (Doc. # 89), and the government responded on August 29, 2005 (Doc. # 96); Defendant filed a reply on September 21, 2005 (Doc. # 103). On October 28, 2005, I conducted an evidentiary hearing on this motion. The government appeared by Assistant United States Attorney Michael Green. Defendant was present, represented by retained

2

attorneys James Wyrsch and Justin Johnston. The government called Gleb Gluhovsky, Dr. Howard L. Houghton, Detective Jeff Seever, Police Officer Robert Brady, Detective Jeff Lawhon, Sergeant Billy Trotter, and Detective Aaron Gietzen. Defendant called Dr. Delany Dean. In addition, the following exhibits were marked and admitted into evidence:

| | |
|---|---|
| Government's Exhibit 1: | 2/4/03 Emergency Physician Report - Health Midwest |
| Government's Exhibit 2: | Consent to Search Residence, dated 4/2/03 |
| Government's Exhibit 2a: | Evidence Log, dated 2/5/03 |
| Government's Exhibit 3: | Picture of two men in Hazmat suits |
| Government's Exhibit 4: | Consent form for Overland Park Regional Medical Center Mental Health Unit |
| Defendant's Exhibit 11: | Psych Report |
| Defendant's Exhibit 15: | Medication Administration Record |
| Defendant's Exhibit 17: | Report of Dr. Delany Dean |
| Defendant's Exhibit 18: | Photographs of books. |

I took judicial notice of the prior reports regarding Defendant's mental state, as well as the most recent report that found him competent to stand trial (Tr. at 193). Following the hearing, the government provided case citations in response to the consent issue raised in Defendant's reply motion.

## II. EVIDENCE

On the basis of the evidence presented at the hearing and the documents attached as exhibits to the motions, I submit the following findings of fact:

1.  Defendant was transported to Overland Park Regional Medical Center by Independence, Missouri Police Officer Robert Brady on February 4, 2003, after expressing suicidal ideations (Tr. at 111-112). A patient cannot report directly to Overland Park Regional Medical Center's Mental Health Unit (Tr. at 36). Instead, he or she must first be seen in the emergency room department to ensure they are stable enough to be admitted (Tr. at 36). After Defendant arrived at

3

Overland Park Regional Medical Center, he was ultimately examined by Emergency Room PA Gluhovsky (Tr. at 8).

2.      PA Gluhovsky is employed by HCAP, a company that contracts out emergency department services to several Kansas City hospitals, including Overland Park Regional Medical Center (Tr. at 7). PA Gluhovsky's duties at these hospitals include performing an initial evaluation of emergency department patients, which includes taking histories, doing initial physical examinations, ordering and interpreting laboratory tests, ordering x-rays or other radiologic studies, and coordinating patient care with the attending physician (Tr. at 7, 8-9).

3.      PA Gluhovsky stated that emergency room physician's assistants are not specialists in psychiatric care and that they defer to the treating psychiatrist (Tr. at 15). PA Gluhovsky, personally, took a course in psychiatric medicine as part of his general curriculum but does not consider himself a specialist in psychiatric medicine (Tr. at 20). As a result, his job as a physician's assistant is to make sure the patient is physically stable to be transferred to the care of a psychiatrist and to inform the call center of the patient's possible admission (Tr. at 16). Based on the information provided by the physician's assistant, the call center then finds an attending/admitting psychiatrist for the patient as well as a room in one of Kansas City's psychiatric facilities (Tr. at 16). After the patient is admitted and under the care of a psychiatrist, PA Gluhovsky in no longer involved in the patient's treatment (Tr. at 16).

4.      After arriving at the Overland Park Regional Medical Center Emergency Room,

4

Defendant was first seen by a triage nurse who took his vital signs and recorded his chief complaint, and an emergency room nurse who also assessed Defendant and compiled a chart (Tr. at 8). PA Gluhovsky then reviewed the chart and met with Defendant (Tr. at 8, 10).

5.      Defendant's chart stated that he presented with depression and suicidal ideation (Tr. at 10). Based on this information, PA Gluhovsky used T-Sheet entitled, "Psych Disorder, Suicide Attempt, Overdose" to conduct and record his intake interview with Defendant (Tr. at 10-11, Gvt. Ex. 1). T-Sheets are forms specific to different medical conditions that are used by hospital staff to help them correctly interview patients and document the pertinent information (Tr. at 10). PA Gluhovsky filled out the T-Sheet accurately and truthfully, understanding that the information he recorded would ultimately be used by the treating psychiatrist to diagnose and treat Defendant (Tr. at 20-21). Treating psychiatrists almost never conduct a second intake interview (Tr. at 22).

6.      During the intake interview, PA Gluhovsky asked Defendant why he was at the hospital (Tr. at 11). Defendant replied that he had a long history of depression that had gotten worse (Tr. at 11). He stated he felt suicidal and sought help from the police department (Tr. at 11). When asked by PA Gluhovsky if he still felt suicidal, Defendant stated that he did (Tr. at 11-12). Defendant further stated that if he did decide to commit suicide, he would do so with cyanide (Tr. at 12). Defendant did not threaten to do physical harm to any identified third parties (Tr. at 24, 29). He did, however, voice dissatisfaction with the FBI and stated that

5

they had ruined his life (Tr. at 28).

7.     Defendant told PA Gluhovsky that he had accumulated cyanide during his career as a chemist and that the cyanide was at his apartment (Tr. at 12). PA viewed Defendant's possession of cyanide as significant both out of concern for public safety and as being relevant to Defendant's diagnosis and treatment in that he had the "plan and means" by which to commit suicide (Tr. at 29, 31-32). When PA Gluhovsky asked Defendant if he would be willing to voluntarily surrender the cyanide, Defendant responded that he would not because he might want to use it later (Tr. at 12-13). PA Gluhovsky inferred from this response that Defendant would want to use the cyanide later on himself or possibly on other people (Tr. at 25). Because Defendant's story seemed probable, in that he was a chemist and would have access to cyanide, PA Gluhovsky treated Defendant's statements very seriously (Tr. at 13).

8.     PA Gluhovsky next conducted a review of Defendant's system to find out whether Defendant had any other significant medical problems that would need attention (Tr. at 13). He also recorded Defendant's past medical history, surgical history, and social history (Tr. at 13). PA Gluhovsky then performed a head-to-toe physical examination on Defendant (Tr. at 13-14). PA Gluhovsky's entire encounter with Defendant lasted approximately twenty minutes and was conducted pursuant to standard operating procedures (Tr. at 14).

9.     PA Gluhovsky did not consult with Dr. Houghton, or any other psychiatrist, during his encounter with Defendant (Tr. at 16-17, 37, 48). The only physician he

6

spoke to was his supervising physician, the emergency room attending physician (Tr. at 17). PA Gluhovsky did not provide any type of counseling services when examining Defendant and did not prescribe any psychotropic medications (Tr. at 17, 20).

10.    After completing the intake interview, PA Gluhovsky ordered laboratory tests to ensure Defendant was physically stable before being considered for admission into the Mental Health Unit (Tr. at 14). He then contacted the call center to inform them of Defendant's potential admission (Tr. at 14). PA Gluhovsky also sought permission from Overland Park Regional Medical Center's Risk Management Department to report Defendant's possession of cyanide to the police (Tr. at 14). Risk Management informed him that he had a duty to report this information due to the potential harm to the public (Tr. at 14-15). Upon receiving permission, PA Gluhovsky called the Independence, Missouri Police Department (Tr. at 15, 26).

11.    PA Gluhovsky conveyed the full story told to him by Defendant to the Independence, Missouri Police Department dispatcher and was informed that someone would come to the hospital to talk to him further (Tr. at 15, 26). Detectives Jeff Seever and Virginia Hill were dispatched to Overland Park Regional Medical Center to speak with Defendant (Tr. at 84). When they arrived at the hospital, PA Gluhovsky advised them that Defendant said he was in possession of cyanide and that he did not want to give it up because he might want to use it later (Tr. at 27).

7

12.     Defendant was ultimately admitted to Overland Park Regional Medical Center's

Mental Health Unit (Tr. at 40, Gvt. Ex. 1).  Detectives Seever and Hill met with

Defendant in his room and asked for permission for police to search Defendant's

apartment for cyanide; Defendant responded that they could and signed a written

consent to search form (Tr. at 91, 101, Gvt. Ex. 2).  On February 5, 2005, police

searched Defendant's apartment and recovered 177 grams of potassium cyanide

(Tr. at 142-143, Gvt. Ex. 2a).

13.     While in the Mental Health Unit, Defendant was placed under the care of

licensed, board-certified psychiatrist Howard Houghton (Tr. at 38, 41, 50).  Dr.

Houghton first met with Defendant on the morning of February 5, 2003 (Tr. at 41,

49-50).  He was familiar with Defendant, as he had seen Defendant on

approximately twelve prior occasions when acting as an on-call doctor (Tr. at 40,

41, 75-76).  Upon meeting with Defendant, Dr. Houghton found his demeanor

"markedly different" than during the prior occasions and was surprised and scared

by his hostility and irritability (Tr. at 41, 42).

14.     While being seen by Dr. Houghton, Defendant made threats to government

agencies including the Corps of Engineers (Tr. at 42, 51).  When he made

comments about wanting to harm others, Dr. Houghton asked for specific names

of individuals in order to obtain an identifiable target (Tr. at 42-43).  Defendant

did not provide any names (Tr. at 43, 51, 57).  After saying that he wanted to

harm others, Defendant stated, out of context, that he had access to chemicals but

would not give Dr. Houghton any further information (Tr. at 43).

8

15.     Dr. Houghton dictated the following observations after examining Defendant:

[Defendant's] mental status examination reveals a dysthymic,[1] but unusually paranoid patient.  He is rather irritable and demanding at times.  At other times, he covers up his head and refuses to talk.  He is marginally cooperative.  He is alert and oriented x 3.  Short and long-term memory seems to be intact.  Regular rate and rhythm of speech.  [Generally] logical thought progression.  He is markedly paranoid.  He is generally alert and oriented. . . . There is no evidence of hallucinations.  Insight and judgment are poor.

[Def. Ex. 11, Tr. at 52-54, 69].

16.     Dr. Houghton's encounter with Defendant caused him concern, as Defendant was "just not the same individual [he] had been used to dealing with on many occasions previously" (Tr. at 43).  He thought Defendant was "much more threatening" based on his threat to the Corps of Engineers and his demeanor (Tr. at 43).  Dr. Houghton explained that it was one thing for an individual to have a rather bland expression and say, "oh, I'm going to kill somebody," but it is another for the individual to do so with emotional intensity (Tr. at 43-44).  He categorized Defendant's February 5, 2003, statements as those made with emotional intensity (Tr. at 44).

---

[1]"Dysthymic" is defined as "[r]elating to dysthymia."  STEDMAN'S MEDICAL DICTIONARY 536 (26th ed. 1995).  Dysthymia is

[a] chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness.

Id.

9

17.    Dr. Houghton considered his communications with Defendant confidential in the context of medical care, but thought Defendant represented a risk to third parties (Tr. at 44, 50, 72-73). Dr. Houghton was unsure if he needed to alert law enforcement to Defendant's threats since Defendant did not identify a specific target; however, Dr. Houghton was fearful that multiple individuals may be at risk (Tr. at 44, 74). He, therefore, contacted Overland Park Regional Medical Center's Risk Management Department for advice on how to approach the situation (Tr. at 44-45). He conveyed that Defendant had made threats toward a specific government agency but that he could not identify who was threatened (Tr. at 74). A few days later, Risk Management advised Dr. Houghton to obtain Defendant's consent so Dr. Houghton could inform law enforcement about Defendant's threatening comments (Tr. at 45, 60-61).

18.    Dr. Houghton met with Defendant and told him he intended to contact the appropriate legal authorities (Tr. at 46, 61-62). Dr. Houghton explained to Defendant that because he was threatening members of the Corps of Engineers and would not identify any specific individuals, the police needed to be made aware of the threats and brought in (Tr. at 46). Dr. Houghton did not explain that, as a result, he could someday be called to testify against Defendant, that his testimony may result in a felony conviction, or that his testimony could result in a long jail sentence (Tr. at 62). When Dr. Houghton asked if it was okay for him to notify the authorities, Defendant responded "yes" (Tr. at 46). Dr. Houghton then told Defendant that a consent form would be brought for to his room for him to

10

sign (Tr. at 46-47). Defendant seemed indifferent (Tr. at 47). Dr. Houghton's

nurse presented Defendant with the consent form and obtained his signature (Tr.

at 71). Dr. Houghton believed Defendant to be competent to execute the form

(Tr. at 71).

19.     The consent form stated, "The staff at Overland Park Regional Medical Center

may release information over the telephone regarding my hospitalization and

conditions only to the following persons" (Gvt. Ex. 4). In the lines underneath

this statement, Defendant handwrote the word "anyone" (Gvt. Ex. 4, Tr. at 47).

20.     On February 13, 2003, after Defendant executed the consent form, Dr. Houghton

was interviewed by Special Agent David Cudmore of the FBI (Tr. at 48, 58). At

the time of the interview, Dr. Houghton did not know that the Independence

Police Department had searched Defendant's apartment on February 5, 2005 (Tr.

at 59-60). Dr. Houghton informed Special Agent Cudmore that Defendant has

had approximately twelve admissions to Overland Park Regional Medical

Center's Mental Health Unit for threatening to commit suicide (Doc. # 89-4). He

explained that he was seriously concerned about the threats Defendant made

toward the federal government (Doc. # 89-4). Dr. Houghton reported that

Defendant told him he had once worked for the Corps of Engineers and, because

of the FBI and CIA, lost his job (Doc. # 89-4). Dr. Houghton told Special Agent

Cudmore that Defendant stated he was going to seek out and harm specific federal

people and said, "And you know I have access to chemicals" (Doc. # 89-4).

According to Dr. Houghton, Defendant was clear about his intention to harm

11

federal employees with chemicals but Dr. Houghton could not recall any specific names of federal employees Defendant wanted to harm (Doc. # 89-4). Dr. Houghton informed Special Agent Cudmore that he thought Ernie Kendal, a nurse in the Mental Health Unit, had specific knowledge of a "threat hit list" that Defendant shared with a female visitor who visited Defendant sometime around February 8th or 9th (Doc. # 89-4). Dr. Houghton advised Special Agent Cudmore that he could contact Nurse Kendal and provided his telephone number (Doc. # 89-4). Finally, Dr. Houghton indicated that he had provided mental health care to Defendant in the recent past (Doc. # 89-4). According to Dr. Houghton, however, Defendant's present state of mind was very disturbing (Doc. # 89-4). Dr. Houghton stated, "[Defendant] is a very intelligent individual and knows, quite well, what is appropriate behavior and what is non-appropriate or wrong behavior" (Doc. # 89-4) He continued, "[Defendant] gives me the creeps and shivers and I am very uncomfortable with his threatening manner toward the federal government. I believe [Defendant] poses a threat to himself and others" (Doc. # 89-4). Dr. Houghton advised Special Agent Cudmore that he would let him know if and when Defendant was allowed to leave Overland Park Regional Medical Center's Mental Health Unit (Doc. # 89-4).

21. Overland Park Regional Medical Center's Mental Health Unit patients who are threatening to themselves are not discharged until they are no longer threatening, unless transferred to a suitable facility (Tr. at 56). When patients are threatening to others, the discharge policy differs depending whether he or she has identified

a target (Tr. at 56). When the patient has an identifiable target, the target has to be notified; with an unidentified target, a pattern of safety and stability must first be established (Tr. at 56). A patient who presents an immediate and identifiable threat to others would not be discharged (Tr. at 56).

22.     At the hearing on the motion in limine, Dr. Delany Dean testified on behalf of Defendant (Tr. at 156-187). Dr. Dean has a Master's Degree in counseling, a J.D., and a PhD in counseling psychology; she is not a psychiatrist (Tr. at 156, 171). She formed her opinion by reviewing Defendant's medical records from local psychiatric hospitals, reports of psychological evaluations conducted at the Federal Medical Center, and based upon her own examinations of Defendant that lasted a total of five to six hours subsequent to his February 4, 2003, hospitalization at Overland Park Regional Medical Center (Tr. at 158, Def. Ex. 17). Based upon these materials, Dr. Dean concluded that Defendant was not competent to execute the consent (Tr. at 168). She opined that Defendant's severe mood disorder and psychosis rendered him unable to appreciate, fully understand, and ultimately waive his rights to keep medical information confidential (Tr. at 168). Dr. Dean also stated that in order to receive valid consent to any procedure, it is necessary to advise the patient as to what the consequences will be (Tr. at 170).

### III.  LEGAL ANALYSIS

Defendant contends that the statements made to PA Gluhovsky and Dr. Houghton while at Overland Park Regional Medical Center are protected under the federal common law

13

psychotherapist-patient privilege. This privilege requires that "confidential communications between a licensed psychotherapist and [his] patients in the course of diagnosis and treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence." Jaffee v. Redmond, 518 U.S. 1, 15 (1996). In recognizing this privilege, the Supreme Court found that the public interest was served "by facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem" Id. at 11. The Court reasoned, "[i]f the privilege were rejected, confidential conversations between psychotherapists and their patient would surely be chilled, particularly when it is obvious that the circumstances that give rise to the need for treatment will probably result in litigation." Id. at 11-12. Because PA Gluhovsky and Dr. Houghton treated Defendant in different capacities, the respective statements will be addressed separately.

### *PA Gluhovsky*

Defendant argues that the statements made to PA Gluhovsky should be excluded from trial under the psychotherapist-patient privilege since PA Gluhovsky, "in his capacity as a physician's assistant, collected the statements in an effort to participate in [Defendant's] diagnosis and treatment, under the supervision of [Defendant's] treating physician, Dr. Howard Houghton." Due to this participation, Defendant urges this court to extend the privilege made to PA Gluhovsky as an agent of the treating psychiatrist. The facts of this case do not support such an extension.

Here, the psychotherapist-patient privilege is not applicable to the statements Defendant made to PA Gluhovsky either acting independently or as an agent of Dr. Houghton. Individually, PA Gluhovsky is not a licensed psychotherapist; he did not have any formal

Case 4:03-cr-00171-KHV   Document 135   Filed 12/21/05   Page 14 of 24

training in psychiatric medicine beyond his curriculum requirements and did not consider himself a specialist in the field. Furthermore, PA Gluhovsky did not provide any form of psychotherapy or counseling services to Defendant while in the Emergency Room. His job was limited to ensuring that Defendant was physically stable to be admitted into the Mental Health Unit and informing the call center of his possible admittance.

Similarly, PA Gluhovsky was not participating in the diagnosis and treatment of Defendant under the direction of Dr. Houghton. When Defendant arrived at Overland Park Medical Center's Emergency Department, PA Gluhovsky independently conducted Defendant's intake interview according to standard operating procedure using a T-Sheet to obtain pertinent information. At no time did he consult with Dr. Houghton, or any other psychiatrist, concerning Defendant. After Defendant was admitted to the Mental Health Unit, PA Gluhovsky's involvement with Defendant was complete.

Although Dr. Houghton did not conduct a second intake interview on Defendant and later reviewed the initial information collected by PA Gluhovsky, these facts alone do not warrant application of the psychotherapist-patient privilege. If anything, the Defendant's statements to PA Gluhovsky are analogous to those made by a patient to his or her physician, for which there is no evidentiary privilege. United States v. Bercier, 848 F.2d 917, 920 (8th Cir. 1988). The statements should, therefore, not be excluded at trial.

### ***Dr. Houghton***

The government concedes that the Defendant's statements to Dr. Houghton "fall squarely within the psychotherapist-privilege recognized by Jaffee." It argues, however, that the statements are still admissible on two separate and distinct grounds. First, the government

15

maintains the statements fall within the dangerous patient exception. The government also claims that Defendant waived this privilege by signing the release of medical information consent form. I find that Defendant's statements could be admitted on either or both grounds.

***Dangerous Patient Exception***

In Jaffee, the Supreme Court did not define the scope of the psychotherapist-patient privilege or create any exceptions. The Court stated in a footnote, however, that:

> Although it would be premature to speculate about most future developments in the federal psychotherapist privilege, we do not doubt that there are situations in which the privilege must give way, for example, if a serious threat of harm to the patient or to others can be averted only be means of a disclosure by the therapist.

Jaffee, 518 U.S. at 18 n.19. Since Jaffee, courts have rendered differing conclusions on whether such an exceptions exists. *See, e.g.*, United States v. Chase, 340 F.3d 978 (9th Cir. 2003); United States v. Hayes, 227 F.3d 578 (6th Cir. 2000); United States v. Glass, 133 F.3d 1356 (10th Cir. 1998).

Both the Sixth and Ninth Circuits have held that there was no dangerous patient exception to the psychotherapist-patient privilege in the context of criminal proceedings. Chase, 340 F.3d at 992; Hayes, 227 F.3d at 586. The Sixth Circuit determined the language contained in the Jaffee footnote was merely dicta and held that it did not establish a binding exception. Hayes, 227 F.3d at 586. In so holding, the Hayes Court differentiated between allowing a psychotherapist to notify a third party of his or her patient's threat under the "duty to protect," and allowing the psychotherapist to testify about that same threat "in a later prosecution of the patient for making it." Id. at 583-84. The Sixth Circuit reasoned that the latter would (1) chill

16

the "atmosphere of confidence and trust" of the psychotherapist-patient relationship and terminate open dialogue, and (2) result in patients not seeking needed professional help. Id. at 584-85.

In Chase, the Ninth Circuit also distinguished between the concepts of confidentiality and testimonial privilege. 340 F.3d at 982 (defining "confidentiality" as "the broad blanket of privacy that state laws place over the psychotherapist-patient relationship," and a "privilege" as "the specific right of a patient to prevent the psychotherapist from testifying in court"). While "[m]ost states have a dangerous patient exception to their psychotherapist-patient confidentiality laws," the existence of such did not "necessarily lead to an abrogation of the federal testimonial privilege." Id. at 984-85 (emphasis omitted). The court agreed with the Sixth Circuit's reasoning for refusing to recognize the exception for two reasons. Id. at 987. First, the protection that justifies a psychotherapist's duty to protect third parties from future acts no longer exists at the time of trial where the focus is, presumably, on past criminal acts. Id. Second, differing state standards governing when a psychotherapist "must (or may) breach confidentiality" would make it difficult, practically, to have a uniform federal testimonial exception. Id. at 987-88. Chase also cited policy justifications for restricting psychotherapist's testimony to only those proceedings aimed at protecting, rather than punishing, his or her patient. Id. at 990.

By contrast, the Tenth Circuit has recognized the dangerous patient exception to the psychotherapist-patient privilege. See Glass, 133 F.3d 1356. In Glass, the Defendant was "voluntarily admitted to the mental health unit for his 'ongoing mental illness.'" Id. at 1357. Defendant told his examining psychotherapist that he wanted to shoot the then-President of the

17

United States and the President's wife. Id. Defendant was released from the hospital after agreeing "to participate in outpatient mental health treatment while residing at his father's home." Id. Ten days after his release, an outpatient nurse learned Defendant was no longer at his father's home and notified the authorities. Id. When Secret Service agents contacted the examining psychotherapist, the psychotherapist divulged Defendant's threat. Id.

The trial court in Glass admitted Defendant's statements without an evidentiary hearing, concluding that "under such compelling circumstances as those presented here of 'an express threat to kill a third party by a person with an established history of mental disorder,' . . . the 'broad privilege recognized by Jaffee is inapplicable.'" Id. Due to the limited record, the Tenth Circuit was unable to determine if the exception applied and remanded the case for a factual determination of whether "the threat was serious when it was uttered and whether its disclosure was the only means of averting harm . . . when the disclosure was made." Id. at 1360.

The Eighth Circuit has not yet rendered a decision of a dangerous patient exception to the psychotherapist-patient privilege. I would agree with the Sixth Circuit in its recognition of the exception; however, I recommend further defining the scope of statements that the psychotherapist may disclose pursuant to this exception.

Despite the public interest in facilitating provision of mental health services, the need for open and frank communication between psychotherapists and patients must be balanced with the interest in preventing harm to identified parties. Permitting a psychotherapist to warn legal authorities of a patient's threats to third parties but not permitting the psychotherapist to then assist authorities in preventing the threatened harm would provide an action without a remedy. In instances where a psychotherapist believes the risk that his or her patient will cause harm to

18

others is significant enough to breach confidentiality, the information forming the basis of the psychotherapist's belief should also fall within the dangerous patient exception to the testimonial privilege.

This authorized disclosure should not be construed to allow psychotherapists to disclose any and all patient communications, however. Just because the patient makes threatening statements, the psychotherapist is not transformed into an *ipso facto* government informant. Under the exception, the psychotherapist should be restricted to revealing only the specific statement(s) that he or she believed constituted a significant risk of harm. The psychotherapist should not be permitted to discuss unrelated confidential information or to continue disclosing communications unless the patient's subsequent statements would independently qualify under the exception. Under this approach, the damage caused to the pyschotherapist-patient relationship is no greater than that already created by the initial breach of confidentiality.

In this case, the statements Defendant made to Dr. Houghton fall both within the factual requirements of dangerous patient exception and the limitations set forth above. Dr. Houghton only reported Defendant's February 5, 2003, threats to the Corps of Engineers to Special Agent Cudmore. He did so based upon his belief that the threats represented a serious threat of harm to others. Dr. Houghton had seen Defendant on a professional basis on at least twelve prior occasions. When he examined Defendant on this occasion, Dr. Houghton was struck by the marked change in his demeanor and the emotional intensity with which he threatened the Corps of Engineers. Dr. Houghton stated, "Defendant gives me the creeps and shivers and I am very uncomfortable with his threatening manner toward the federal government." This level of concern and the potential implication of harm to multiple third parties prompted him to speak

Case 4:03-cr-00171-KHV   Document 135   Filed 12/21/05   Page 19 of 24

with Risk Management about breaching confidentiality and disclosing Defendant's threats.

In addition, Dr. Houghton believed that his disclosure was necessary to prevent harm. At the time Dr. Houghton was interviewed by Special Agent Cudmore, he did not know that the Independence, Missouri Police Department had already recovered 177 grams of cyanide from Defendant's apartment. Even if he would have had this information, Dr. Houghton would still not have been assured that future harm to third parties had been averted. Defendant never specified the quantity of cyanide to which he had access or revealed where the cyanide was kept. Moreover, the threat of harm to others still existed even though Defendant was not free to leave the Mental Health Unit since Defendant was thought to have shared a "threat hit list" with a female visitor after admission. Defendant's statements to Dr. Houghton should, therefore, be admitted under the dangerous patient exception at trial.

*Waiver*

"Like other testimonial privileges, the patient may of course waive the protection" of the psychotherapist-patient privilege. Jaffee, 518 U.S. at 15 n.14. A waiver is "an intentional, voluntary, knowing, and intelligent relinquishment or abandonment of a known right or privilege." United States v. Black Bear, 422 F.3d 658, 663 (8th Cir. 2005).

In United States v. Wimberly, the Seventh Circuit found that a Defendant could waive the psychotherapist-patient privilege by signing an authorization form.[2] 60 F.3d 281, 285 (7th Cir. 1995). Specifically, the defendant in that case admitted to his psychotherapist that he had molested the victim and also that he had molested another stepdaughter approximately thirteen

---

[2]The Seventh Circuit decided Wimberly prior to the Supreme Court's decision in Jaffee. The timing of these opinions does not make Wimberly any less persuasive, however, as the Seventh Circuit had already adopted a psychotherapist-patient privilege in Jaffee v. Redmond, 51 F.3d 1346 (7th Cir. 1995). Furthermore, Wimberly's application of the law on waiver was not affected by the subsequent decision.

years earlier.  Id. at 284.  Prior to undergoing counseling, however, the defendant had signed an authorization form that released his counseling records, reports and opinions to both the victim's mother and to the FBI.  Id. at 285.  The form read, "I have been informed that the State of Illinois severely limits confidentiality in cases involving child abuse and that the CYN staff is required by law to report cases of known or suspected child abuse to local authorities."  Id. at n.2.  In affirming the denial of the defendant's motion in limine to exclude the psychotherapist's testimony, the Seventh Circuit held that the privilege had been waived.  Id. at 285.

Defendant argues, here, that the consent form he signed does not serve as a waiver.  In support of his argument, Defendant relies on United States v. Hayes, in which the Sixth Circuit held that "in order to secure a valid waiver of the protections of the psychotherapist-patient privilege from a patient, a psychotherapist must provide that patient with an explanation of the consequences of that waiver suited to the unique needs of that patient."  227 F.3d 587.  In Hayes, the defendant's psychotherapists advised him that they had a duty to warn third parties and that serious threats toward others could not be kept confidential.  Id. at 580.[3]  The defendant chose to continue discussions even after being warned on three different occasions of this "duty to protect," and despite the warning, proceeded to detail exactly how he planned to kill his supervisor.  Id. at 585, 588.  Because the defendant's psychotherapists never "informed him of the possibility that they might testify against him," or that they "may one day assist in procuring his conviction and incarceration," the court determined that the defendant did not knowingly and voluntarily waive his right to assert the psychotherapist-patient privilege.  Id. at 586.

_____

[3]The defendant's social worker told him,"I cannot keep that [homicidal ideation . . . ] within the confines of the room."  Hayes, 227 F.3d at 588 (Boggs, J., dissenting).

I would decline to adopt the Sixth Circuit's reasoning in <u>Hayes</u>.  Psychotherapists should not be required to spell out each and every possible outcome that may result from disclosure.  All that should be required for a waiver to be valid is the patient's intentional, voluntary, knowing, and intelligent consent to contact law enforcement officers.  Here, Defendant's signature on the consent form, coupled with the context in which the form was presented to him, satisfies that requirement.

Dr. Houghton informed Defendant that he intended to contact the appropriate legal authorities.  He explained that because Defendant was threatening members of the Corps of Engineers, the police needed to be made aware of the threats and brought in.  After hearing this explanation, Defendant gave Dr. Houghton permission to contact the police and executed the consent form.  Although the consent was designed for the general release of medical information, Dr. Houghton's conversation with Defendant made clear that Defendant was authorizing Dr. Houghton to contact legal authorities.

When an individual is told that legal authorities are going to be contacted concerning his or her threats to harm a third party, it is the logical conclusion that authorities will investigate those threats and, if incriminating evidence is revealed, institute the appropriate legal proceedings.  Here,  Defendant has a PhD in chemistry and is a man of above average intelligence.  Dr. Houghton's statements were sufficient to put him on notice that disclosure would certainly lead to a police investigation and may, possibly, even result in criminal prosecution.  However, Defendant still chose to authorize Dr. Houghton to notify the authorities, executed the consent form and, accordingly, waived his testimonial privilege.

The validity of Defendant's waiver should not be called into questions solely because

Defendant executed the form while a patient in the Mental Health Unit. Although Defendant's expert, Dr. Dean, opined at the hearing that Defendant was not competent to waive his right to keep medical information confidential, the court is not bound by her conclusion. Indeed, Dr. Houghton -- Defendant's treating psychiatrist and the individual who obtained his consent -- offered a differing opinion. Dr. Houghton testified that based upon his examination and observation of Defendant, Defendant was competent to execute the consent form. Therefore, Defendant's waiver should not be deemed invalid on this ground.

For the above-stated reasons, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying Defendant's Motion in Limine.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of this report and recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

/s/ Robert E. Larsen

Case 4:03-cr-00171-KHV   Document 135   Filed 12/21/05   Page 23 of 24

ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
December 21, 2005