IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
          Plaintiff,            )
                                )
v.                              )     Criminal Action No.
                                )     03-00171-01-CR-W-ODS
HESSAM GHANE,                   )
                                )
          Defendant.            )

## REPORT AND RECOMMENDATION

Before the court is the government's motion for determination of competency (Doc. No. 217). The government seeks to have Defendant found incompetent to stand trial, arguing that Defendant's core delusional beliefs have returned. Defendant opposes this motion and maintains he is competent.

## I. BACKGROUND

On July 18, 2006, the government moved for a judicial determination of mental competency (Doc. No. 217). In support of its motion, the government referenced the following excerpt from Dr. Robert G. Lucking's, April 12, 2006, report:

> The primary evaluator continues to have concerns regarding the foundation and fundamental structure of Mr. Ghane's current competency. Mr. Ghane is currently not expressing any beliefs or ideas which would lead one to believe that he is not competent. The primary evaluator again offers the observation that the Court and attorneys will need to be vigilant over the course of the legal proceedings for the re-emergence of his previous delusional beliefs. If the stress of the legal proceedings results in the re-emergence of his delusional beliefs, he will need to be returned for further evaluation.

The motion stated that Dr. Lucking's charge, coupled with Defendant's July of 2006 *pro se* pleadings and information from the medical staff at Corrections Corporation of America ("CCA") that

Defendant was not taking his anti-psychotic medication as prescribed, led the government to believe Defendant might be suffering from a mental disease or defect that rendered him mentally incompetent to assist in his own defense. In response to the government's motion, I ordered that Defendant undergo a local psychological evaluation to be conducted by Dr. John H. Wisner (Doc. No. 219).

By way of history, Defendant has been examined by Dr. Wisner once before. The court appointed Dr. Wisner on November 25, 2003 (Doc. No. 32), to examine Defendant in order to address whether Defendant met the requirements for involuntary administration of anti-psychotic medication as set forth in Sell v. United States, 539 U.S. 166 (2003). Dr. Wisner opined, *inter alia*, that Defendant's delusional disorder rendered him incompetent to stand trial because of the paranoid nature of the disorder and his preoccupation with the content of his delusions (See Doc. No. 44).

Defendant has also been evaluated by Dr. Lucking at the Federal Medical Center in Butner, North Carolina ("FMC-Butner") on three separate occasions. This court first ordered Defendant undergo a competency evaluation on May 21, 2003. On August 15, 2003, Dr. Lucking opined that Defendant was incompetent to stand trial. That opinion was supported by Defendant's own examining expert (See Doc. Nos. 25, 27). I, therefore, issued a report and recommendation finding Defendant was not competent to stand trial and recommending that he be committed to the custody of the Attorney General for hospitalization and treatment pursuant to 18 U.S.C. § 4241(d) (Doc. No. 25); the district court adopted my report and recommendation in its entirety (Doc. No. 27).

Defendant unequivocally refused to take anti-psychotic medication to treat his delusional disorder, and stated that he would refuse to cooperate with treatment even if ordered to do so by this court. (See Doc. No. 44). Accordingly, the government then made a motion pursuant to Sell v.

2

United States, asking that Defendant be forcibly medicated to restore him to competency to stand trial (Doc. No. 29). Following a Sell hearing, the district court adopted my report and recommendation and ordered that Defendant be involuntarily administered a trial of anti-psychotic medication. (See Doc. No. 50). Defendant appealed.

On December 20, 2004, the Eighth Circuit reversed this court's decision, holding that the government had not sustained its burden of demonstrating a substantial likelihood that Defendant could be restored to competency through involuntary medication. United States v. Ghane, 392 F.3d 317, 320 (8th Cir. 2004). As a result, Defendant was returned to FMC-Butner for a four-month commitment period for evaluation and any treatment that he would accept voluntarily. (See Doc. No. 58).

On July 5, 2005, this court received a report of Dr. Lucking's second psychological evaluation, wherein he found Defendant had been restored to competence and was capable of assisting in his defense. According to the report, Defendant expressed a strong interest in being found competent so that his case could proceed to trial. He agreed to undergo treatment with anti-psychotic medication shortly after his admission to the medical center. Defendant was also treated for complaints of anxiety. His depressive symptoms and insomnia did not initially respond to treatment. Following a change in medication, however, Defendant reportedly showed a marked improvement with better sleeping, clearer thinking, and decreased paranoia. He requested additional treatment for depression, and reported improvement with treatment.

On June 30, 2005, Defendant was returned to the CCA. This court found Defendant competent to stand trial and assist in his legal defense on August 1, 2005 (Doc. No. 80). Defendant's case was set for trial on January 17, 2006 (Doc. No. 145). On January 4, 2006, however, Justin

Johnston, counsel for Defendant, contacted me with a concern regarding Defendant's competency to stand trial. On January 6, 2006, I held a hearing to determine the factual basis for Mr. Johnston's concern. At the hearing, Mr. Johnston stated that Defendant's core delusional beliefs had returned. He filed a formal motion for a judicial determination of mental competency on January 10, 2006 (Doc. No. 154).

I ordered Defendant to undergo a psychiatric evaluation and recommended that, for continuity purposes, the evaluation be conducted by Dr. Robert G. Lucking at FMC-Butner (Doc. No. 152). I received Dr. Lucking's third report, dated April 12, 2006, in which he found Defendant competent to stand trial and aid in his own defense. According the report, Defendant's anti-psychotic medication was discontinued upon his return to CCA in June of 2005, due to the staff psychiatrist's concern regarding the possible negative effects the drug had on Defendant's blood sugar and serum lipids. Dr. Lucking's initial interview of Defendant after he returned to FMC-Butner in 2006 evidenced "a disorder of content of thought with a return of the paranoid themes noted on previous evaluation periods." Defendant was again administered the anti-psychotic drug. At the conclusion of the evaluation/treatment, Dr. Lucking opined that Defendant had "returned to the baseline level of functioning exhibited at the end of the last evaluation; at which he was considered competent."

On May 2, 2006, I held a competency hearing. Defendant was present, represented by Justin Johnston. The government was represented by Assistant United States Attorney Mike Green. Dr. Lucking also attended the hearing via telephone. The parties stipulated to the content and findings of Dr. Lucking's report. On May 30, 2006, Defendant was found competent to stand trial (Doc. No. 185). Defendant's case was ultimately placed on the July 31, 2006, trial docket (Doc. No. 196).

As stated above, the government filed a motion for determination of competency on July 18,

4

2006, and I ordered Defendant to undergo a local psychological evaluation with Dr. Wisner. I have received Dr. Wisner's report, dated July 27, 2006, in which he finds Defendant incompetent to stand trial and aid in his own defense. On August 2, 2006, I held a competency hearing. Defendant was present, represented by Jim Wyrsch. The government was represented by Assistant United States Attorney Mike Green. The government called Dr. Wisner to testify. In addition, the following exhibits were marked, sealed and admitted into evidence:

| | |
|---|---|
| Government's Sealed Exhibit 1: | *Pro Se* Filing, dated 07/10/06; |
| Government's Sealed Exhibit 2: | *Pro Se* Filing, dated 07/10/06; |
| Government's Sealed Exhibit 3: | *Pro Se* Filing, dated 07/17/06; |
| Government's Sealed Exhibit 3a: | *Pro Se* Filing, dated 07/17/06; |
| Government's Sealed Exhibit 3b: | *Pro Se* Filing, dated 07/17/06; |
| Government's Sealed Exhibit 4: | Letter to Disciplinary Council; |
| Government's Sealed Exhibit 5: | Dr. Wisner's Report, dated 07/27/06; |
| Government's Sealed Exhibit 6: | Dr. Lucking's Report, dated 08/15/03; |
| Government's Sealed Exhibit 8: | Dr. Lucking's Report, dated 04/12/06; |
| Defendant's Sealed Exhibit 3: | Dr. Lucking's Report, dated 07/06/05; |
| Court's Sealed Exhibit 1: | Dr. Wisner's Report, dated 12/30/03. |

Dr. Lucking was not available to participate in the competency hearing; therefore, the hearing was continued until August 10, 2006 (Doc. No. 229).

On August 10, 2006, I held the second portion of Defendant's competency hearing. Defendant was present, represented by Jim Wyrsch. The government was represented by Assistant United States Attorney Mike Green. The government called Dr. Lucking to testify. Defendant made a proffer regarding Justin Johnston and Michelle Dorrance's July 17, 2006, meeting with Defendant at CCA. At the conclusion of the hearing, Mr. Wyrsch requested that the court keep the record open so as to possibly receive the testimony of Dr. Scott Bowlin and of Defendant (08/10/06 Tr. at 53-55). I granted Defendant's request, and the competency hearing was scheduled to reconvene on August

23, 2006 (Doc. No. 242). Due to the unavailability of Defendant's witnesses, the hearing was continued until August 30, 2006 (Doc. No. 245).

On August 30, 2006, I held the third and final portion of Defendant's competency hearing. Defendant was present, represented by Jim Wyrsch. The government was represented by Assistant United States Attorney Mike Green. The parties offered a joint stipulation of Dr. Scott Bowlin's testimony for purposes of the competency hearing. Defendant called Federal Bureau of Investigation Special Agent David Cudmore to testify; Defendant also testified on his own behalf. The following exhibits were marked and admitted into evidence:

Government's Exhibit 1: 08/14/06 *Pro Se* Motion to Request Recusal of Magistrate Judge;

Defendant's Exhibit 1: Joint Stipulation re: testimony of Dr. Scott Bowlin;
Defendant's Exhibit 2: Wall Street Journal article, dated 07/11/06.

## II. EVIDENCE

On the basis of the evidence present at the competency hearings, I submit the following findings of fact:

1.     For a number of years before being arrested on the instant charge, Defendant had received psychiatric treatment (08/30/06 Tr. at 34; Gvt. Exh. 6, at 4-5). While in treatment, Defendant took his medication(s) (08/30/06 Tr. at 34).

2.     Dr. Lucking first examined Defendant in 2003, at which time Defendant's instant charges had been pending approximately three months, and prepared a report dated August 15, 2003 (08/02/06 Tr. at 60-61; 08/10/06 Tr. at 5; Gvt. Exh. 6). As part of the evaluation, Dr. Lucking reviewed all of Defendant's medical history; the records revealed Defendant had an extensive

psychiatric history with multiple admissions for substance abuse, depression and suicidal ideation (08/10/06 Tr. at 30). Psychological tests were also administered (08/10/06 Tr. at 26; Gvt. Exh. 6, at 11).

3.     In his report, Dr. Lucking diagnosed Defendant with delusional disorder - paranoid type (08/10/06 Tr. at 6; Gvt. Exh. 6, at 11). His diagnosis was based upon Defendant's presentation, his report of the events leading to his arrest, his perception of why he was arrested and his belief that he was being persecuted by multiple government agencies (08/10/06 Tr. at 6). Dr. Lucking ultimately found Defendant incompetent to assist in his own defense (Gvt. Exh. 6, at 15-17; 08/02/06 Tr. at 61; 08/10/06 Tr. at 7).

4.     Dr. Lucking generally described the symptoms of delusional disorder - paranoid type as a non-bizarre delusional system that organizes an individual's life and upon which the individual bases a fair amount of his or her actions (08/10/06 Tr. at 6, 26). A non-bizarre delusion refers to something that could possibly occur (08/10/06 Tr. at 26). The delusion typically dominates the individual's life (08/10/06 Tr. at 7).

5.     With respect to Defendant's specific delusions, Dr. Lucking testified that Defendant was basing many of his actions, judgments, and perceptions on the delusional belief that he was being persecuted by multiple government agencies, including the Central Intelligence Agency ("CIA") and Army Corps of Engineers (08/10/06 Tr. at 7).

6.     On November 10, 2003, this court found Defendant was not competent to stand trial (Def. Exh. 3, at 1). In preparation for a Sell hearing, Dr. Wisner first examined Defendant on December 15, 2003, and prepared a report dated December 30, 2003 (08/02/06 Tr. at 6-7; Court's Exh. 1). Dr. Wisner opined, *inter alia*, that Defendant suffered from delusional disorder - paranoid

7

version, in that Defendant had a fixed and compelling idea that he was under systematic persecution by the United States government (08/02/06 Tr. at 10, 46; Court's Exh. 1). This delusion had been present for at least some years prior to the time he examined Defendant (08/02/06 Tr. at 10; Court's Exh. 1). Dr. Wisner also diagnosed Defendant with recurrent depressive disorder that was in remission (08/02/06 Tr. at 46-47; Court's Exh. 1).

7. According to Dr. Wisner, delusional disorder is only seen in adults over the age of forty (08/02/06 Tr. at 10). The most significant characteristic of the disorder is the presence of either a persecutory or a jealous or an erotomanic delusion (08/02/06 Tr. at 10-11). A delusional individual either believes that he or she is being persecuted by concerted forces or that an important person, such as a spouse or lover, is being unfaithful (08/02/06 Tr. at 11). Delusional disorder is not accompanied by any other symptoms; there are no other disturbances of thinking or behavior (08/02/06 Tr. at 11). As a result, the individual suffering from the disorder is psychologically/psychiatrically normal and retains all of their ordinary mental capacity except the ability to test out, accept or use evidence that is contrary to the reality of the delusion (08/02/06 Tr. at 11).

8. Based on his December 15, 2003, evaluation, Dr. Wisner testified that Defendant's delusional disorder was the persecutory or paranoid variety (08/02/06 Tr. at 11). Defendant had a fixed delusion that, as a result of having refused recruitment by the CIA some years ago, he has been under consistent scrutiny and maligned attention from the United States government (08/02/06 Tr. at 11-12).

9. Following a Sell hearing, this court ordered Defendant could be involuntarily medicated (Def. Exh. 3, at 1). On December 20, 2004, the Eighth Circuit overruled this court's decision (Def. Exh. 3, at 1; 08/30/06 Tr. at 13-14). Despite the Eighth Circuit's ruling, Defendant

Case 4:03-cr-00171-KHV   Document 260   Filed 09/25/06   Page 8 of 28

decided on his own to take anti-psychotic medication so that he could be restored to competency (08/30/06 Tr. at 14, 37).

10 On January 4, 2005, this court ordered that Defendant be committed to the custody of the Attorney General for evaluation and whatever treatment he accepted voluntarily for a period not to exceed four months (Def. Exh. 3, at 2; Gvt. Exh. 8, at 2). Defendant was again evaluated by Dr. Lucking at FMC-Butner, who had an opportunity to observe Defendant over a period of time and establish a medication regimen (See 08/10/06 Tr. at 7; Def. Exh. 3). Defendant was treated with 600 milligrams of Seroquel and with Paroxetine (08/10/06 Tr. at 8; Def. Exh. 3). Dr. Lucking's July 6, 2005, report stated that, with the use of medication, Defendant had become competent to stand trial (08/02/06 Tr. at 53; 08/10/06 Tr. at 8, 25). The report, in part, stated:

> Of some concern is the foundation and fundamental structure of Mr. Ghane's current competency. Mr. Ghane is currently not expressing any beliefs or ideas which would lead one to believe that he is not competent. However, his statement that he, quote, "did not want to be delusional, so I changed my mind," unquote, is somewhat bothersome to the primary evaluator. The very nature and definition of a delusional belief makes it unamenable to rational, logical argumentation or decision-making. Just as one does not "decide" to be delusional, one cannot decide "not to be delusional." Mr. Ghane is a highly intelligent individual who is capable of understanding the information and how the information was used to render the opinion of incompetency. At this point in time it is not clinically possible to ascertain whether Mr. Ghane has developed an understanding of what to say and what not to say in order to be considered competent or whether he has experienced a change in the core organizing principles and core beliefs of his previously demonstrated paranoid delusional system. The current weight of the evidence presented by Mr. Ghane is in favor of his being competent. However, the test, of course, will be whether he is able to maintain his improvement over the course of the legal proceedings without the re-emergence of his previous delusional beliefs. If the stress of the legal proceedings results in the re-emergence of his delusional beliefs, he will need to be returned for further evaluation.

(Def. Exh. 3, at 8-9; 08/02/06 Tr. at 53-55; 08/10/06 Tr. at 8-11). No formal psychological testing was conducted in reaching this conclusion (08/10/06 Tr. at 26; Gvt. Exh. 8).

9

11.     When Defendant was returned from FMC-Butner on June 30, 2005, medical personnel at CCA gradually eliminated his anti-psychotic medication due to concern about the effect the medication might have on Defendant's diabetes treatment (08/10/06 Tr. at 40; 08/30/06 Tr. at 17; Gvt. Exh. 8, at 3).  The decision to stop administering Seroquel to Defendant was made by CCA staff psychiatrist Dr. Linda McCandless; Defendant did not play a role in making this decision (08/30/06 Tr. at 17; Gvt. Exh. 3b).

12.     On January 9, 2006, this Court ordered Defendant undergo another evaluation at FMC-Butner.  When returned to FMC-Butner for the third time, Defendant had not been receiving his medication (08/10/06 Tr. at 13, 40; Gvt. Exh. 8).  Defendant appeared significantly worse than when Dr. Lucking first saw him (08/10/06 Tr. at 13).  Defendant was again placed on 600 milligrams of Seroquel (08/02/06 Tr. at 31; 08/10/06 Tr. at 12-13; 08/30/06 Tr. at 14, 18; Gvt. Exh. 8).

13.     In his April 12, 2006, report, Dr. Lucking diagnosed Defendant under Axis I with major depressive disorder, recurrent and moderate (08/10/06 Tr. at 32; Gvt. Exh. 8, at 7).  He testified that Defendant appeared to improve with use of the medication to the point where he considered Defendant competent to assist in his own defense (08/02/06 Tr. at 21; 08/10/06 Tr. at 11-13, 25; 08/30/06 Tr. at 14; Gvt. Exh. 8, at 6).  However, Dr. Lucking was unsure whether Defendant was actually less delusional or if the medication had caused some reintegration in Defendant's thinking that allowed Defendant to tell Dr. Lucking what he needed to hear in order to find Defendant competent (08/10/06 Tr. at 13, 40-41; Gvt. Exh. 8). In relevant part, the report read:

> The primary evaluator continues to have concerns regarding the foundation and fundamental structure of Mr. Ghane's current competency.  Mr. Ghane is currently not expressing any beliefs or ideas which would lead one to believe that he is not competent.  The primary attorneys will need to be vigilant over the course of the legal proceedings for the re-emergence of his previous delusional beliefs.  If the stress of

Case 4:03-cr-00171-KHV   Document 260   Filed 09/25/06   Page 10 of 28

the legal proceedings results in the re-emergence of his delusional beliefs, he will need to be returned for further evaluation.

(Gvt. Exh. 8, at 8; 08/02/06 Tr. at 56; 08/10/06 Tr. at 12-13). No formal psychological testing was conducted in reaching this conclusion (08/10/06 Tr. at 26; Gvt. Exh. 8).

14.     Part of the reason Dr. Lucking found Defendant competent was Defendant's indication that he could work with his lawyers (08/02/06 Gvt. Exh. 8; 08/02/06 Tr. at 21; 08/10/06 Tr. at 15). Dr. Lucking stated Defendant seemed to come to an understanding during his period of observation that his lawyers were not working against his interest (08/10/06 Tr. at 15; Gvt. Exh. 8).

15.     During his observation period, however, Defendant wrote a letter to the Office of the Chief Disciplinary Council of the Missouri Bar ("Disciplinary Council") regarding his relationship with his lawyers (08/02/06 Gvt. Exh. 4; 08/02/06 Tr. at 22-23; 08/10/06 Tr. at 16). Although there is no specific date on the letter, the postmark indicates the letter was received by the Disciplinary Council on April 7, 2006 (08/02/06 Gvt. Exh. 4; 08/02/06 Tr. at 22-23; 08/30/06 Tr. at 38). Furthermore, a sentence within the text of the letter reads, "But [n]ow is March 28, 2006." (08/02/06 Gvt. Exh. 4, at 3; 08/02/06 Tr. at 22-23; 08/10/06 Tr. at 16). As of March 28, 2006, Defendant was being administered 600 milligrams of Seroquel a day (08/10/06 Tr. at 16).

16.     Defendant testified that, at the time he wrote the letter, he was not one "hundred percent sure" his lawyers were working with the prosecutor behind his back because he was not actually there (08/30/06 Tr. at 40-41). He became suspicious about the relationship between his lawyers and the prosecutor due to the delay in proceedings (08/30/06 Tr. at 40). He was also angry that his lawyer "testified and breached the confidentiality of information that I talked to them [about] before going to jury trial" (08/30/06 Tr. at 41).

17.	In this letter to the Disciplinary Council, Defendant wrote, "I have no dought [sic] that my attorneys have sold me to the Prosecutor." (Gvt. Exh. 4, at 2; 08/10/06 Tr. at 14).  Defendant complained about the nature of his relationship with his lawyers, the fact that he was unhappy with what they have done, that he does not trust them, and that they have worked against him (08/10/06 Tr. at 14-15, 16; 08/30/06 Tr. at 40; Gvt. Exh. 4).  The letter states, in part:

> Again, I do not have any doubts that my two Attorneys have worked behind my back and against me and assisted the Prosecutor, the FBI, and the Marshals to provide a Disarray in the Defense by either to cause dismay for these six to seven inmates (by keeping them at CCA while they have all been sentenced and wishing to go to their BOP destinations) or try to intimidate them not to testify on my behalf.  By my being away, this plot on my back was achieved by my lawyers!  One other sign is that, Mr. Wyrsch, an old, long-time lawyer, did not himself testified [sic] against me in the Court, but he used his help to do this.  Of course, this had to be done with the blessing of the Prosecutor and the Judge.

(Gvt. Exh. 4, at 3; 08/30/06 Tr. at 39-40).

18.	When asked whether he wrote a line in the letter reading, "This is another sign since he [Mr. Johnston] sold me out to the prosecutor," Defendant admitted he did (08/30/06 Tr. at 40; 08/30/06 Gvt. Exh. 4, at 5).  Defendant further stated after the August 10, 2006, hearing, he observed Mr. Johnson and Mr. Green leave the courtroom together (08/30/06 Tr. at 40).  He thought "they might be relating information together" as "part of a game that the lawyers and prosecutors play" (08/30/06 Tr. at 40).

19.	Dr. Lucking was not aware of Defendant's letter to the Disciplinary Council at the time Defendant wrote the letter or at the time he completed his April 12, 2006, psychological evaluation (08/10/06 Tr. at 13-14, 16, 42).  The fact that Defendant wrote this letter, as well as the information contained therein, would have been important to Dr. Lucking in reaching a conclusion about Defendant's competency (08/10/06 Tr. at 14).  Specifically, Defendant's complaints about his

Case 4:03-cr-00171-KHV   Document 260   Filed 09/25/06   Page 12 of 28

relationship with his attorneys indicated to Dr. Lucking that, during the evaluation, Defendant was telling him what he needed to hear in order to determine Defendant was competent when, in reality, Defendant's underlying fundamental core beliefs were still paranoid and the delusion system was quite active and interfering with his ability to work with his lawyers (08/10/06 Tr. at 15). Had Dr. Lucking had this information at the time he prepared his April 12, 2006, report, he would have likely found Defendant incompetent on the basis that Defendant was unable to assist in his own defense (08/10/06 Tr. at 42, 43).

20.     Defendant testified that although he did not tell Dr. Lucking about the letter, he was not attempting to hide anything about his condition (08/30/06 Tr. at 18-19, 42-43). He stated he was just protesting about what he felt his lawyers had done (08/30/06 Tr. at 19). Defendant testified he "totally cooperated" with Dr. Lucking while at FMC-Butner (08/30/06 Tr. at 25). Defendant only answered the questions posed to him by Dr. Lucking (08/30/06 Tr. at 44). He chose not to tell Dr. Lucking "everything that [he did in his] life" because the information would ultimately be conveyed to the prosecutor, his lawyers and the judge (08/30/06 Tr. at 41-42). He did not think the fact that he wrote a letter to the Disciplinary Council was important for Dr. Lucking to know (08/30/06 Tr. at 44). Defendant felt as though Dr. Lucking searched for issues to find him incompetent (08/30/06 Tr. at 44).

21.     Concerning the 2006 evaluation, Defendant testified Dr. Lucking "took one week of vacation to delay the process for me to come back to CCA and assist the defense. So, disarray is going to be produced in my inmates that are testifying on my behalf." (08/30/06 Tr. at 42).

22.     When Defendant was discharged from FMC-Butner in April of 2006, he was receiving 600 milligrams of Seroquel (08/10/06 Tr. at 43). Medical personnel at CCA reduced his

13

dosage to 500 milligrams due to concerns about possible side effects on Defendant's physical health (08/10/06 Tr. at 43). Dr. Lucking did not consider this to be a significant reduction (08/10/06 Tr. at 44).

23.     On at least one occasion after being returned to CCA, Defendant placed the Seroquel he was administered in his cheek and did not take the medication (08/30/06 Tr. at 15). He testified that he did so because Seroquel makes him very tired and, within a hour or an hour and a half after taking the medication, he goes to sleep (08/30/06 Tr. at 15). Medical personnel at CCA gave Defendant his Seroquel at 3:30 p.m., the same time he received insulin for his diabetes, thereby causing him to fall asleep around 4:30 p.m. (08/30/06 Tr. at 16). Defendant testified that when he did not take the Seroquel when administered, he took it later that night (08/30/06 Tr. at 16; Gvt. Exh. 3b). Defendant stated he never refused to take his medications and, in fact, chose to continue taking the Seroquel despite Dr. McCandless' concern that it might negatively impact his diabetes treatment (08/30/06 Tr. at 16).

24.     In July of 2006, Defendant wrote five separate *pro se* letters to the court (See Gvt. Exhs.1, 2, 3, 3a, 3b). Government's Exhibit 1 from the August 2, 2006, competency hearing is a letter dated July 10, 2006, that Defendant filed with the court requesting certain witnesses be called at his trial (08/02/06 Gvt. Exh. 1; 08/02/06 Tr. at 15; 08/10/06 Tr. at 17). Defendant wanted to cross-examine, *inter alia*, District Judge Gary Fenner concerning his dismissal of several important cases while he was a Missouri state appellate court judge and of Defendant's employment discrimination claim against the Army Corps of Engineers (08/02/06 Gvt. Exh. 1; 08/02/06 Tr. at 15-16; 08/10/06 Tr. at 17). Defendant also wanted to cross-examine: James Garman, former or current employee of the Army Corps of Engineers about Defendant's June 4, 1993, wrongful

14

termination; Robert Howard, CIA, who Defendant alleges met with him on May 25, 1993, at Tyson's Corner Maryland; William Robbin, lawyer who handled Defendant's discrimination case against the Army Corps of Engineers; and Cynthia Stilwell, previous girlfriend (08/02/06 Gvt. Exh. 1; 08/02/06 Tr. at 16, 52; 08/10/06 Tr. at 17).

Government's Exhibit 2 is a letter, dated July 10, 2006, in which Defendant responded to the Court's order setting pretrial conferences (Gvt. Exh. 2). Government's Exhibit 3, dated July 17, 2006, is Defendant's "continued response to court memorandum of 06-28-06" (Gvt. Exh. 3). Government's Exhibit 3a, dated July 17, 2006, is Defendant's "Constitutional request to have adequate time to address the court" (Gvt. Exh. 3a). Government's Exhibit 3b, dated July 17, 2006, is Defendant's "response to court memorandum of 06-28-06" (Gvt. Exh. 3b). Each of these motions was filed when Defendant was represented by retained counsel.

25. Government's Exhibits 1, 2, 3, 3a and 3b address issues that other non-psychotic accused might present, such as a demand for a speedy trial, although discussion of such issues are mixed with delusional concerns (08/02/06 Tr. at 41, 50).

26. Defendant testified that he prepared Government's Exhibit 1 close in time to the pretrial conference (08/30/06 Tr. at 20). He stated he sent a copy of the witness list both to the court and to his lawyers in an effort to be proactive since he had not had sufficient time to discuss the matter with his lawyers (08/30/06 Tr. at 20-21, 48). Defendant thought he would have the opportunity to go over the list with his lawyers at a later date and possibly eliminate unnecessary witnesses (08/30/06 Tr. at 48-49). He wanted to make sure everything got done and all legal positions were before the court (08/30/06 Tr. at 55). Defendant further testified that through his various *pro se* filings, he was trying to clear himself and assist in his defense the best way he knew

how (08/30/06 Tr. at 23-24). Nevertheless, he understood he was represented by lawyers and that his lawyers' job was to speak for him in court (08/30/06 Tr. at 45-46).

27. Dr. Wisner was ordered to evaluate Defendant again by this court in July of 2006 (08/02/06 Tr. at 12; Gvt. Exh. 5). In preparing for the evaluation, Dr. Wisner reviewed numerous *pro se* filings (i.e., 08/02/06 Gvt. Exhs. 1, 2, 3, 3a, and 3b) (08/02/06 Tr. at 12-14, 34; Gvt. Exh. 5). He noted that Defendant did not express himself in a clear, succinct, and grammatical manner in the writings (08/02/06 Tr. at 49). Dr. Wisner did not speak to any of the doctors who treated Defendant before he was charged with the instant alleged offense (08/02/06 Tr. at 37). He did, however, review Dr. Desai's records prior to rendering his 2003 report (08/02/06 Tr. at 38).

28. On July 24, 2006, Dr. Wisner attempted to interview Defendant but was unsuccessful (08/02/06 Tr. at 18-19). Defendant refused to shake Dr. Wisner's hand and informed him that he would, under no circumstances, participate in an examination since Dr. Wisner's 2003 report was evidence that Dr. Wisner had become part of the conspiracy to persecute him and was working for the government against him (08/02/06 Tr. at 19, 37). Dr. Wisner did not think it significant that Defendant refused to talk to him, but did find it significant that Defendant thought he had become part of the conspiracy (08/02/06 Tr. at 19-20).

29. Defendant testified he did not consent to an interview with Dr. Wisner because he wanted his lawyer and an interpreter present (08/30/06 Tr. at 27, 28).

30. During the less than twenty minutes Dr. Wisner spent with Defendant on July 24, 2006, Defendant was able to understand the general questions posed by Dr. Wisner and respond appropriately (08/02/06 Tr. at 42; Gvt. Exh. 5).

31. Government's Exhibits 1, 2, 3, 3a and 3b all indicated to Dr. Wisner that Defendant

16

is filtering the current legal process through his delusions concerning government activities dating back to his dismissal from the Corps of Engineers and subsequent lawsuits dating back to 1990 through 1993 (08/02/06 Tr. at 17, 52-53; 08/02/06 Gvt. Exhs. 1, 2, 3, 3a, 3b). Review of these exhibits, particularly Government's Exhibit 1, demonstrate an ever-widening pool of individuals who are persecuting him (08/02/06 Tr. at 17; 08/02/06 Gvt. Exh. 1). That is, Defendant first believed Judge Fenner conspired against him; over time, however, this conspiracy grew to include his former girlfriend, Dr. Lucking, and now even includes Dr. Wisner (08/02/06 Tr. at 18). In other words, everyone who has encountered Defendant with respect to his legal problems has become part of the vast government conspiracy against him (08/02/06 Tr. at 18).

32. Dr. Wisner believed that Government's Exhibits 1, 2, 3, 3a and 3b bear out Dr. Lucking's fear, as described in his July 6, 2005, report, that Defendant's delusional beliefs may re-emerge (08/02/06 Tr. at 55). He explained that Defendant's delusional thinking was present even at times when he had thoughts and was able to make conclusions less influenced by the delusions, but the delusions were never completely absent (08/02/06 Tr. at 55).

33. In addition, Dr. Wisner testified that Defendant's letter to the Disciplinary Council reflects the influence of Defendant's delusional disorder (08/02/06 Tr. at 23). He found an irreconcilable conflict between Defendant writing this letter and Dr. Lucking's finding that Defendant would be able to work with his lawyers (08/02/06 Tr. at 23-24). This conflict indicated to Dr. Wisner that Defendant's delusions were still present and active (08/02/06 Tr. at 24).

34. Dr. Wisner described Defendant as engaging in "double-entry bookkeeping," meaning that Defendant's delusions still influence his thoughts and activities but he is not preoccupied by the delusions and can hypothetically consider other things (08/02/06 Tr. at 24).

17

Defendant can appear as though he is not acting on his delusions, but they are still present and continue to interfere with his ability to focus on the instant legal matter (08/02/06 Tr. at 24).

35.     When asked to assume that Defendant was on a regimen of 500 milligrams of Seroquel when he wrote Government's Exhibits 1, 2, 3, 3a and 3b, Dr. Wisner responded that the exhibits represented Defendant's very significant preoccupation with his delusions and, likewise, indicated only a partial response to his medication regimen (08/02/06 Tr. at 26-27).

36.     On August 2, 2006, Dr. Wisner opined in accordance with his July 27, 2006, report that Defendant was not capable of cooperating with his lawyers in order to pursue an adequate defense since Defendant's delusional disorder was in a current active stage (08/02/06 Tr. at 27, 33, 34; 08/02/06 Gvt. Exh. 5, at 2).  He testified that he believed Defendant technically understood the charges against him, but such understanding was tainted by Defendant's perception that the case stemmed from his refusal to cooperate with the CIA and the government's subsequent punitive response (08/02/06 Tr. at 32).

37.     Dr. Lucking testified at the August 10, 2006, competency hearing that Defendant's *pro se* witness list demonstrated Defendant's delusional belief stemming from his idea that multiple individuals and government agencies were persecuting him for refusing to work for the CIA (08/10/06 Tr. at 18).  Additionally, he thought the list indicated Defendant was quite suspicious and paranoid of the court and what he believed the court was attempting to do to him (08/10/06 Tr. at 18-19, referencing 08/02/06 Gvt. Exh. 1, at 3).

38.     Dr. Lucking stated that the *pro se* letters, coupled with the fact that Defendant wrote his letter to the Disciplinary Council when on 600 milligrams of Seroquel, demonstrated Defendant's medication was not producing the desired effect (08/10/06 Tr. at 44).

18

39.     Review of Defendant's *pro se* filings as a whole also concerned Dr. Lucking, as the writings appeared disorganized, were difficult to follow, tended to repeat themselves, were difficult to follow concerning the logical train of thought and sometimes the logical train of thought appeared to break down (08/10/06 Tr. at 19-20). Dr. Lucking believed the filings evidenced a thought disorder both in form and content (08/10/06 Tr. at 20).

40.     Based on his review of Defendant's *pro se* filings from July 10, 2006, July 25, 2006, and July 26, 2006, his letter to the Disciplinary Council, and in light of previous dealings with Defendant, Dr. Lucking opined at the August 10, 2006, competency hearing that Defendant was not competent (08/10/06 Tr. at 20-21). He formed this opinion because Defendant's continued active delusional beliefs were interfering with his ability to work with his lawyers (08/10/06 Tr. at 21). Psychological testing was not performed and Dr. Lucking had not met with or interviewed Defendant since March of 2006 (08/30/06 Tr. at 26). He did, however, review Defendant's writings, which is considers an important factor in diagnosing and treating an individual (08/10/06 Tr. at 19).

41.     Dr. Lucking stated that Defendant's lawyers, particularly Mr. Johnston, had become part of Defendant's system of delusional beliefs (08/10/06 Tr. at 21). This demonstrated a progression and expansion of his delusional beliefs despite being treated with adequate doses of anti-psychotic agents (08/10/06 Tr. at 21).

42.     Dr. Lucking believed Defendant understands the nature of the charge against him quite well (08/10/06 Tr. at 34). He also believes that Defendant understands the nature of the proceedings and could understand evidence offered/questions posed to him during courtroom proceedings (08/10/06 Tr. at 34-35, 39).

43.     On July 17, 2006, Federal Bureau of Investigation Special Agent David Cudmore

19

obtained handwriting samples from Defendant at CCA; Mr. Johnston and Ms. Dorrance were also present (08/30/06 Tr. at 8-9). At one point when the samples were being collected, Mr. Johnston advised Defendant against giving a specific sample that could be testimonial in nature (08/30/06 Tr. at 10-11). Although Defendant wanted to continue, he followed Mr. Johnston's directive (08/30/06 Tr. at 11).

44.     On July 17, 2006, Defendant met with defense counsel, Justin Johnston, and paralegal, Michelle Dorrance (08/02/06 Tr. at 34-35; 08/10/06 Tr. at 33, 49; 08/30/06 Tr. at 21, 48-49). Defendant, Mr. Johnston and Ms. Dorrance reviewed Defendant's *pro se* letter that listed the witnesses he wished to call at trial, Government's Exhibit 1, and agreed to eliminate a number of witnesses whose testimony would be irrelevant to the elements of the offense for which he had been charged (08/02/06 Tr. at 35; 08/10/06 Tr. at 33, 49-50; 08/30/06 Tr. at 21-22, 49). Defendant agreed to accept Mr. Johnston's advice not to call certain individuals as witnesses (08/02/06 Tr. at 35; 08/10/06 Tr. at 33, 49-50; 08/30/06 Tr. at 21-22, 49, 50).

45.     The fact that Defendant agreed to limit the number of witness called at trial would not change Dr. Wisner's ultimate opinion that Defendant is incompetent to stand trial (08/02/06 Tr. at 35). Dr. Wisner explained that his opinion regarding Defendant's competence was not based on the fact that Defendant prepared the witness list; rather, the list merely demonstrated that Defendant's thought process and interactions with counsel are still based on a desire to try the United States government as a defense against the current charges (08/02/06 Tr. at 35). Dr. Wisner stated Defendant agreeing with Mr. Johnston and Ms. Dorrance is indicative of "double-entry bookkeeping" (08/02/06 Tr. at 67).

46.     Likewise, Dr. Wisner's opinion regarding Defendant's competence would not be

altered if he learned that Defendant wrote to the Disciplinary Council when angry at his lawyers for having him returned to FMC-Butner, but that he was no longer angry at his lawyers (08/02/06 Tr. at 36). Dr. Wisner believed that this explanation illustrated the cause for concern documented in Dr. Lucking's April 12, 2006 report, in that as Dr. Lucking reported Defendant seemed to be expressing an understanding of the importance of working with his lawyers, he was simultaneously writing a letter to the Disciplinary Counsel complaining about them (08/02/06 Tr. at 57-58).

47. At the August 30, 2006, competency hearing, Defendant testified that many of the individuals on his *pro se* witness list related to his employment with the Corps of Engineers (08/30/06 Tr. at 47). He stated he did not connect his 1993 firing from the Corps of Engineers with the charge brought against him in 2003, but was instead trying to refute Dr. Houghton's testimony in this case that he wanted to harm his colleagues at the Corps of Engineers (08/30/06 Tr. at 47-48).

48. Defendant had been diagnosed with depression and delusional disorder a number of years before facing the instant charge and, despite undergoing treatment, was basically able to function in the community (Court's Exh. 1, at 2; 08/02/06 Tr. at 38-39, 67-68; 08/30/06 Tr. at 34). Defendant has held jobs with the Corps of Engineers, as a professor at Maple Woods Community College, as a professor in Donnelly College's Health Department, and as a chemist in various capacities (08/30/06 Tr. at 34-35). Dr. Lucking testified that the fact Defendant functioned significantly better ten or fifteen years ago was not inconsistent with his current diagnosis (08/10/06 Tr. at 30).

49. Dr. Wisner believed Defendant's delusional disorder was a freestanding diagnosis, unassociated with depression (08/02/06 Tr. at 47). Likewise, Dr. Lucking testified that the fact that Defendant has not been treated for major depressive disorder has not contributed to his delusional

21

disorder (08/10/06 Tr. at 33).

50.     Defendant has also been diagnosed by Dr. Lucking with psychosocial and environmental problems related to interaction with the legal system (Gvt. Exh. 8, at 7; 08/10/06 Tr. at 29). Dr. Lucking believed that the stress of impending trial increased the influence of Defendant's delusional beliefs on his behavior (08/10/06 Tr. at 29). He also thought that the length of time Defendant had been in custody probably contributed somewhat to Defendant's underlying paranoia and delusional beliefs (08/10/06 Tr. at 32).

51.     Dr. Wisner was aware of Dr. Lucking's diagnosis of psychosocial and environmental problems (08/02/06 Tr. at 47). He did not believe that these problems (i.e., frustration from being in custody and awaiting trial for over three years) were the cause of or had any bearing on the severity of Defendant's delusional disorder (08/02/06 Tr. at 47-48, 60).

52.     Dr. Wisner testified that it was possible for an individual with delusional disorder to be competent to stand trial (08/02/06 Tr. at 70).

53.     Dr. Lucking testified that Defendant did not have any significant disciplinary problems while at FMC-Butner (08/10/06 Tr. at 31). Defendant was never written up for being disruptive either at FMC-Butner or at CCA (08/30/06 Tr. at 25, 26).

54.     When Dr. Scott Bowlin, treating physician at CCA, has spoken to Defendant, Defendant speaks cogently and appears alert as to person, place and time (Def. Exh. 1).

55.     Defendant testified he understands the nature of the charges against him, the various court proceedings, and is able to communicate with and assist his lawyers in his defense (08/30/06 Tr. at 29-30).

56.     Defendant has a number of medical conditions that require him to understand and

cooperate with physicians in the treatment of his conditions (08/30/06 Tr. at 30-33).

57.     On August 14, 2006, Defendant wrote a *pro se* Motion for Request for Recusal of the Magistrate Judge (08/30/06 Tr. at 50; 08/30/06 Gvt. Exh. 1). In the motion, Defendant requests recusal because, "The magistrate [j]udge has, beyond shadow of doubt, . . . clearly shown his partiality, negativ[e] bias towards the Defendant" (08/30/06 Gvt. Exh. 1, at 2). To prove this bias, Defendant cites appointment of the Federal Public Defender at the inception of his case, failure to promptly address his request for appointment of another lawyer, wrongfully sending him to FMC-Butner for "Restoration to Competency," allowing the prosecutor to access Defendant's records while denying his requests to access criminal records of individuals who plan to testify against him, scheduling a hearing while Defendant was still recuperating from a hospital stay, ordering multiple psychological evaluations by Dr. Lucking, failing to allow Defendant to speak on his own behalf during proceedings in which he was represented by counsel or to personally cross-examine psychiatrists by whom he has been examined, and failing to provide a Farsi-English translator (08/30/06 Gvt. Exh. 1). Defendant also refers to Dr. Wisner and Dr. Lucking as "puppets" of the court (08/30/06 Gvt. Exh. 1). Because his lawyers refused to file such a motion on his behalf, Defendant "took the initiative" and did so himself (08/30/06 Tr. at 51).

58.     On page ten of this *pro se* motion requesting recusal, Defendant again requests that he be allowed to call Cynthia Stilwell and James Garman as witnesses even though he agreed with Mr. Johnston on July 17, 2006, that they should not be called (08/30/06 Tr. at 52; 08/30/06 Gvt. Exh. 1, at 10-12). Defendant explained at the August 30, 2006, competency hearing that he did not want Ms. Stilwell and Mr. Garman called regarding his "wrongful discharge from the Corps of Engineers," but to show that he is not a terrorist (08/30/06 Tr. at 52-54).

23

59.    Over the course of the three-part competency hearing, Defendant objected to the fact that he was not permitted to act on his own behalf during the proceedings (08/10/06 Tr. at 22-24, 55-56).    Specifically, he wanted to cross-examine Dr. Lucking himself (08/10/06 Tr. at 22-24). Defendant also objected to the manner in which his lawyer presented evidence (08/30/06 Tr. at 3-7; 49-50).  He objected to the fact that Dr. Bowlin's testimony was presented by stipulation (08/30/06 Tr. at 3).  He further stated:

> I have objection that this proceeding became a full-fledged testimony or cross-examination of Mr. Johnston and Ms. Dorrance but was taken as a proffer, but when things are against me, Dr. Wisner comes in here, lies and sells his degree but by being competency, he's going to be full-fledged cross-examination.  But when it comes to my favor that this list has been reduced to whatever Justin wanted - - Mr. Johnston wanted, and then there shouldn't be any incompetency evaluation, they're going to be proffered rather than - - is going to be belittled rather than being proceeded in cross examination.

(08/30/06 Tr. at 49-50).  Defendant also objected to the proceedings on the basis that Mr. Wyrsch did not know what questions to ask of Dr. Wisner and Dr. Lucking since he was not there during the evaluations and wanted to conduct cross examinations himself (08/30/06 Tr. at 5-6).  Defendant made all these objections despite Mr. Wyrsch having explained the procedure for presenting evidence "extensively" ((08/30/06 Tr. at 6).

### III.  LEGAL ANALYSIS

The question of Defendant's competency currently being considered by the court was raised by motion of the government.  The government cannot "constitutionally bring an incompetent defendant to trial."  United States v. Sell, 282 F.3d 560, 568 (8th Cir. 2002), rev'd on other grounds, 539 U.S. 166 (2003).  "The test for determining competence to stand trial is whether the defendant has 'a sufficient present ability to consult with his . . . lawyer with a reasonable degree of rational

24

understanding and whether [the defendant] has a rational as well as factual understanding of the proceedings against him.'" Vogt v. United States, 88 F.3d 587, 591 (8th Cir. 1996)(quoting Dusky v. United States, 362 U.S. 402, 402 (1960)). I recommend the court find that Defendant possesses neither an ability to assist his lawyers nor an understanding of the proceedings against him.

### Ability to Assist Lawyers

The first prong of the two-prong test for determining competence to stand trial requires a defendant to have "'a sufficient present ability to consult with his . . . lawyer with a reasonable degree of rational understanding.'" Id. Defendant does not have this ability.

Defendant has been diagnosed with delusional disorder - paranoid type. His delusions are based on the belief that a vast conspiracy of government persecution exists against him, all connected to events that occurred in the early 1990s. In line with this delusion, Defendant believes that his attorneys are working against his interests and/or that they are not providing an adequate defense.

The delusion's interference with Defendant's ability to work with his lawyers is not a new development. Dr. Lucking noted in his April 12, 2006, report that part of the reason he found Defendant to be competent was that, over the course of the evaluation, Defendant seemed to come to an understanding that his lawyers were not working against him. However, during the same period of time, unbeknownst to Dr. Lucking, Defendant wrote a letter to the Disciplinary Council containing allegations that his lawyers had "sold" him to the prosecutor and were working behind his back. Dr. Lucking testified he likely would not have found Defendant competent in April of 2006 had he known this information, as the letter indicated Defendant's delusion system was active and interfering with his ability to assist his lawyers.

During the August 2, 2006, and August 10, 2006, competency hearings, Dr. Wisner and Dr.

Case 4:03-cr-00171-KHV   Document 260   Filed 09/25/06   Page 25 of 28

Lucking respectively opined that Defendant was incapable of assisting his lawyers and, therefore, not competent to stand trial. Even though Dr. Wisner's July 24, 2006, evaluation was very brief and Defendant did not consent to an interview, the nature of this encounter coupled with Dr. Wisner's familiarity with Defendant from a previous examination in this case and his review of Defendant's various *pro se* filings allowed him to reach his ultimate conclusion. Likewise, Dr. Lucking was able to render an informed opinion despite not having personally observed or interviewed Defendant on this occasion because of his longitudinal familiarity with Defendant's mental health and review of the current written expressions of Defendant's delusional beliefs.

Defendant's July of 2006 *pro se* letters, his testimony at the August 30, 2006, competency hearing, and his behavior over the course of the three-part competency hearing all demonstrate that his delusional belief system continues to render him unable to sufficiently aid his lawyers in his defense. The *pro se* letters all evidence delusional concerns; however, Government's Exhibit 1 best illustrates how Defendant's delusions interfere with his relationship with his attorneys. On July 10, 2006, Defendant wrote a letter containing a list of witness he wanted to be called at trial. The testimony that a number of these witnesses could provide have no relevance to the instant charge. Rather, they relate to Defendant's termination from the Corps of Engineers and his alleged refusal to work as a spy for the CIA. Although Defendant offered evidence that he agreed such witnesses were not necessary after consulting with Mr. Johnston, his August 14, 2006, *pro se* motion indicates otherwise. In this motion, as well as in his August 30, 2006, testimony, Defendant again disagreed with his attorneys and stated he wants to elicit the testimony of Cynthia Stilwell and James Garman at trial.

I also observe Defendant's recent behavior to demonstrate his inability to assist his lawyers

26

with a reasonable degree of understanding. Aside from the influence his delusions play on the content of his *pro se* filings, the fact that Defendant continues to file such motions despite being represented by counsel reflects Defendant's distrust in his lawyers and/or his feeling that his attorneys are not advancing his interests to the court. The record on the instant motion for determination of competency contains five *pro se* filings and I note that Defendant has filed numerous others since being returned from his last competency evaluation. Additionally, Defendant objected to Mr. Wyrsch's manner of presenting evidence and wanted to cross examine Drs. Wisner and Lucking himself during the competency hearings even though his lawyers had "extensively" explained the proper procedure to him beforehand. The court should find Defendant is unable to sufficiently assist in his defense and, as a result, not competent to stand trial.

### *Understanding of the Proceedings*

The second prong of the test for determining competency requires a defendant to have both a rational and factual understanding of the proceedings. Id. Distinction between "rational" and "factual" understanding is key to this analysis. Defendant is highly intelligent and has a factual understanding of the proceedings against him. He understands the charge against him as well as procedural and legal issues such as the Speedy Trial Act, competency, and the attorney-client relationship. He also understands evidence and is able to appropriately respond to questions asked of him during hearings.

Defendant's understanding is not, however, rational. As stated above, Defendant's delusion is premised on a government conspiracy against him. As Dr. Wisner and Dr. Lucking both explained, this delusion of government persecution taints Defendant's perception of concepts he factually understands. Defendant believes that nearly all of the actors in the instant proceedings are

Case 4:03-cr-00171-KHV   Document 260   Filed 09/25/06   Page 27 of 28

part of the conspiracy against him. Specifically, Defendant describes Drs. Wisner and Lucking as "puppets" and believes they are part of the conspiracy because they have found him incompetent. Defendant believes his lawyers are part of the conspiracy and stated that they have "sold" him to the prosecutor. He similarly includes the court in this conspiracy. Without a rational, delusion-free understanding, Defendant does not truly understand the proceedings against him and should thus be found incompetent.

For the above-stated reasons, it is

RECOMMENDED that the court, after making an independent review of the record and applicable law, enter an order finding Defendant is not competent to continue with the proceedings and to assist in his defense.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 22, 2006

28